IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 1, 2023

**IN RE JALIYAH S. ET AL.**

**Appeal from the Circuit Court for Davidson County
No. 21A-100 Laurence M. McMillan, Jr., Chancellor**

_____

**No. M2023-00554-COA-R3-PT**

_____

This is a termination of parental rights case. Appellant/Mother appeals the termination of her parental rights to the three minor children on the ground of severe child abuse and on the trial court's finding that termination of her rights is in the children's best interests. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Affirmed and Remanded**

KENNY ARMSTRONG, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and THOMAS R. FRIERSON, II, J., joined.

Nick Perenich, Nashville, Tennessee, for the appellant, Tamika S.[1]

Jonathan Skrmetti, Attorney General and Reporter, and Clifton Wade Barnett, Assistant Attorney General, for the appellees, Tennessee Department of Children's Services, and Earlene S.[2]

**OPINION**

**I. Background**

Appellant Tamika S. ("Mother") is the biological mother of Jaliyah S. (d.o.b. May 2015), and twins, Zaylen S., and Zaliyah S. (d.o.b. December 2016) (the "Twins," and

---

[1] In cases involving minor children, it is the policy of this Court to redact the parties' names so as to protect their identities.

[2] As discussed *infra*, Earlene S. is the children's grandmother. She initially petitioned for termination of Appellant's parental rights, and the Tennessee Department of Children's Services joined her petition. She filed notice in this Court that she was joining in the Department's brief.

together with Jaliyah S., the "Children").[3] Jaliyah was born prematurely, with her fraternal twin Jordan, who died at 20 months old.[4] In September 2015, December 2015, and February 2016, medical personnel at Vanderbilt University Children's Hospital ("Vanderbilt") diagnosed Jaliyah with "failure to thrive" based on the fact that, although she was approximately 9 months old, she was the size of a newborn. According to the record, when Jaliyah was in the care of hospital staff or Earlene S. ("Grandmother"), she gained appropriate weight. Furthermore, Mother demonstrated erratic behaviors regarding Jaliyah's care. Specifically, Mother failed to bring Jaliyah to several medical appointments, refused to have the child immunized, and stopped giving her prescribed acid-reflux medication. All of this culminated in the Department of Children's Services ("DCS," and together with Grandmother, "Appellees") filing a dependency-and-neglect petition regarding Jaliyah. By order of August 31, 2016, the Juvenile Court of Davidson County adjudicated Jaliyah dependent and neglected; the juvenile court affirmed its prior ruling after Mother requested a rehearing on the dispositional order. Mother then appealed to the Circuit Court for Davidson County ("trial court"), and the trial court ordered that Jaliyah would remain in Grandmother's care. Mother did not appeal the trial court's order, and Jaliyah has remained in Grandmother's care throughout these proceedings.

At the time of Jaliyah's disposition, Mother was pregnant with the Twins, who were born in December 2016. On January 3, 2017, DCS received a referral regarding the Twins. A Child Protective Services investigator attempted to visit Mother's home to ensure the Twins' wellbeing, but Mother resisted that visit and a subsequent visit when DCS returned with officers and a court order of removal to DCS custody. The juvenile court scheduled a preliminary hearing regarding the Twins on January 6, 2017.

On January 6, Mother appeared before the juvenile court with Mr. Zuri McGee Stines but without the Twins.[5] Mother denied that the Twins were hers and stated that she had a surrogacy relationship with Mr. Stines. Mother also stated that Mr. Stines was the Twins' biological father and that the Twins resided with him. Mother's statements were false. Ultimately, Mother revealed the Twins' location. When DCS first observed the Twins, it was immediately apparent that they were malnourished and in need of immediate care. Because the Twins were very thin, had skin hanging from their limbs, and had dark circles under their eyes they were quickly admitted to Vanderbilt, where it was determined that Zaylen had gained no weight since his birth and Zaliyah had gained only 100 grams. After being admitted to Vanderbilt, the Twins' health improved quickly.

---

[3] Mother has given birth to seven children: Ziria, Zayden, Jordan, Jaliyah, Zaylen, Zaliyah, and Yemaya. Both Zayden and Jordan have passed away. Mother's parental rights to Ziria and Yemaya are not the subject of these proceedings. However, Ziria and Yemaya will be mentioned as is relevant to provide a complete picture of the family.

[4] The specific cause of Jordan's death was never determined.

[5] Mr. Stines is a transgendered man.

On January 13, 2017, the juvenile court ordered Mother to complete a psychological evaluation. In February 2017, the court entered a permanency plan hearing order under which Mother was to participate in a psychological intake/evaluation, participate in mental health counseling as recommended, and attend grief counseling. Mother opposed signing a release for her medical records relating to her therapy. In its January 2018 permanency hearing order, the juvenile court found that, although DCS had made reasonable efforts to assist Mother with her counseling, Mother was not in substantial compliance with the plan because she had not completed a psychological evaluation.

The juvenile court and the trial court, on de novo review, adjudicated the Twins dependent and neglected and the victims of severe child abuse perpetrated by Mother. Mother appealed the trial court's order as to the Twins. In *In re Zaliyah S.*, No. M2019-01241-COA-R3-JV, 2020 WL 3494471 (Tenn. Ct. App. June 26, 2020), this Court affirmed the trial court's judgment that the Twins were dependent and neglected due to severe child abuse perpetrated by Mother. *Id.* at *9. The Twins remained in DCS custody, and DCS placed them with Grandmother.

On October 24, 2017, criminal charges were brought against Mother. On December 14, 2018, a jury found Mother guilty of two counts of child neglect of a child under eight years based on the Twins' condition. *See* Tenn. Code Ann. § 39-15-401. Mother was sentenced to twenty-days incarceration beginning on December 28, 2018. Following her release, she was placed on supervised probation for two years. Mother completed her probation and has not incurred further criminal charges. As part of her criminal court proceedings, Mother was ordered to participate in a forensic evaluation for competency purposes. The evaluation indicated that Mother had mild post-traumatic symptoms stemming from her reported childhood abuse and a personality disorder. Mother's personality disorder consisted of her having a "tendency toward suspiciousness and a broad difficulty with social interactions." In effect, the disorder "would make her overly wary of others and vulnerable to feeling slighted or taken advantage of," which could have implications in her interactions with healthcare providers. In particular, the evaluation cited Mother's distrust of Vanderbilt providers due to her feeling that she had "been wronged" by them. The evaluation stated that "[i]t is within the realm of possibility that [Mother] would disregard a healthcare provider's advice on the mistaken belief that it was not in her or her children's best interest." The evaluation found that none of Mother's psychological issues would "impair her enough to render her unable to appreciate the nature or wrongfulness of her actions." Throughout these proceedings, scheduling medical procedures and obtaining prescriptions for the Children has been difficult due to Mother's lack of consent and Mother's distrust of medical providers. When Jaliyah was prescribed acid-reflux medication, Mother stopped administering the medication. Zaliyah also needed surgery regarding her tongue-tie, but Mother would not consent. There was also a delay regarding Zaliyah's adenoid surgery. Mother has always opposed vaccinations. At trial, she opined that vaccines are dangerous and untested, and she believes it is in the Children's best interest to not receive age-appropriate vaccinations because "they have been doing

well without it."

Concerning Mother's other children, who are not the subject of the immediate appeal, Ziria was born on January 5, 2013. During the dependency-and-neglect proceedings involving Jaliyah, Mother filed a petition to change legal custody of Ziria to Mother's father's wife, Constance M. Mother had unsupervised visits with Ziria until Ziria was adjudicated dependent and neglected based on Mother's severe abuse of the Twins. Ziria no longer resides with Constance M. due to an incident where Ziria attempted to stab Constance M. with a knife. Grandmother was granted custody of Ziria, which Mother opposed. Ziria started rebelling against Grandmother, and the Children began to imitate Ziria's behaviors. Grandmother placed the Children in therapy to overcome those issues before it was "too late." At the time of the hearing in this case, Ziria was doing better in her placement with Grandmother and was doing well in school. At the time of trial, Mother had not seen Ziria for approximately two years, but recently resumed supervised visitation.

Yemaya was born in January 2019. Yemaya was removed from Mother's custody at birth and was placed with her father, Clifton C. by an immediate protection agreement. Although Yemaya was subsequently declared to be dependent and neglected based on Mother's history with her other children, custody was not removed from Mother, and Yemaya remains in the joint custody of Mother and Clifton C. Concerning Mother's living arrangements, at the time of trial, she resided in a two-bedroom apartment with Yemaya. The apartment is not large enough for the Children, but Mother has talked with apartment management about acquiring a larger space.

Around December 2019, DCS requested that Mother participate in a parenting capacity assessment, which she did. The parenting assessment recommended that: (1) any child in Mother's custody needs to be under the care of a pediatrician and receive recommended treatment and monitoring; (2) healthcare providers should be aware of Mother's history of child neglect and should be given access to all healthcare information they deem necessary; (3) healthcare decision-making authority be placed in another adult rather than Mother; and (4) Mother not be able to home school any children in her care. Based on the assessment, the juvenile court implemented the assessment's recommendations regarding Mother's custody of Yemaya and further ordered Mother to continue counseling until she was discharged by a counselor.

Following a January 2021 permanency hearing order, the juvenile court found that Mother needed to engage in recommended psychological therapy. Further, the court found that Mother was not in substantial compliance with the permanency plan in that DCS needed to receive documentation of Mother's psychotherapy. Mother would not sign a release so that DCS could acquire the information. At trial, Mother testified that she was seeing a counselor; however, she provided no documentation regarding her compliance with mental health services. Mother testified that she provided DCS with a release to obtain such information. However, Mother actually signed her own release for information, not

the one DCS requested she sign. As such, DCS has not seen any of Mother's mental health records.

Turning to Mother's relationship with Grandmother, before the Children were removed from Mother's custody, she and Grandmother had a good relationship. However, the relationship began to sour after Grandmother testified against Mother in juvenile court, and Mother blamed Grandmother for the Children's current placement. During the dependency-and-neglect proceedings, Mother testified that she would rather have Jaliyah live with strangers than with Grandmother. Mother has not spoken to or visited with Grandmother for years. At trial, Mother testified that Grandmother was physically abusive to Mother when she was a child. Mother claimed that DCS investigated Grandmother, but Grandmother chased the DCS case worker away by cussing at her, and nothing occurred afterwards. Mother testified that her actions during the dependency-and-neglect proceedings, including her lies, were a "reaction" from her trauma. Grandmother denied ever abusing Mother, and no credible witness corroborated Mother's account. Furthermore, DCS has no record of investigating Grandmother for potential abuse. Although Mother testified that she "wanted to do whatever to repair" her relationship with Grandmother, the evidence shows that Mother has made little attempt to reconcile with Grandmother. When Grandmother supervised visitations, Mother went through Grandmother's home and opened cabinets to take pictures of medication, which caused Grandmother to stop visits. Mother denied taking pictures of the Children's medication. However, the trial court stated that it "gave little weight" to Mother's testimony regarding conflicts with the testimony of another witness found to be credible, and the trial court gave "great weight" to Grandmother's testimony. Accordingly, Mother was found to not be credible on this point.

Now, Mother refuses to allow Grandmother to supervise visits with any of the Children. Mother has informed Grandmother that if Grandmother were to get the Children, Mother would "kidnap" them. Mother told Jaliyah that she was "kidnapped." Mother also told the Twins that they are going to live with her. When asked why she thought Grandmother was unsuitable to supervise the Children, Mother could only complain of an incident where she bought shoes for the Children that were never worn. However, Grandmother explained that the shoes Mother bought were too small. Otherwise, Mother could not think of any reason why Grandmother is not taking good care of the Children. Grandmother, on the other hand, testified that she will work with Mother if Mother does not fight her on parenting issues, such as making medical decisions. Grandmother does not trust Mother's judgment regarding medical decisions.

Jaliyah has been in DCS custody, and in Grandmother's care, since she was eight months old. Regarding Mother's supervised visits with Jaliyah, Grandmother has full discretion. Mother did not see Jaliyah from the summer of 2018 to March of 2019. Grandmother then supervised visits between Mother and Jaliyah, but visits stopped after Mother went through Grandmother's cabinets to take pictures of the Children's medication, *see supra*. At the time of trial, Mother had not exercised visitation with Jaliyah for over a

year. Mother testified that Grandmother prohibited her from visiting Jaliyah. However, Grandmother testified that she would have "no problem" allowing Mother to visit Jaliyah if she called and asked for visitation.

Currently, Mother has been afforded sixteen hours of visitation with the Twins each month. However, Mother only visits the Twins two or three times a month due to her work schedule. Mother has cancelled visits on multiple occasions such that Mother is required to confirm the visit the night before the visit occurs. Mother still canceled several visits on the day they were to occur.

On October 28, 2021, Grandmother petitioned to terminate Mother's rights to Jaliyah, Zaylen, and Zaliyah. On December 21, 2021, DCS filed a motion to join Grandmother's petition. On June 16, 2022, Mother filed her answer. The trial court heard the petition on December 19, 2022. By order of March 15, 2023, the trial court terminated Mother's parental rights to the Children on the ground of severe child abuse and on its finding that termination of Mother's rights is in the Children's best interest. Mother appeals.

## II. Issues

There are two dispositive issues: (1) Whether there is clear and convincing evidence to support the ground of severe child abuse; and (2) if so, whether there is clear and convincing evidence to support the trial court's determination that termination of Mother's parental rights is in the Children's best interests.

## III. Standard of Review

It is well-settled that:

A parent's right to the care and custody of [his or] her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clause of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors....' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745 (1982); *In re Angela E.*, 303 S.W.3d at 250.

- 6 -

***In re Carrington H.***, 483 S.W.3d 507, 522-23 (Tenn. 2016) (footnote omitted). In Tennessee, termination of parental rights proceedings are governed by statute, ***In re Kaliyah S.***, 455 S.W.3d 533, 541 (Tenn. 2015), and the statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." ***In re Jacobe M.J.***, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting ***In re W.B.***, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g))) (internal quotation marks omitted).

Tennessee Code Annotated section 36-1-113 governs the termination of parental rights in this state. It provides, in pertinent part:

> (c) Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
>
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

Tenn. Code Ann. § 36-1-113(c). Therefore, every termination of parental rights case requires the trial court "to determine whether the parent has engaged in a course of action or inaction that constitutes one of the statutory grounds for termination[]" and whether termination of the parent's rights is in the child's best interest. ***In re Donna E.W.***, No. M2013-02856-COA-R3PT, 2014 WL 2918107, at *2 (Tenn. Ct. App. June 24, 2014). "Because the stakes are so profoundly high[]" in a termination of parental rights case, the statute "requires persons seeking to terminate a … parent's parental rights to prove the statutory grounds for termination by clear and convincing evidence." ***In re Audrey S.***, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). This Court has observed that:

> This heightened burden of proof minimizes the risk of erroneous decisions. ***In re C.W.W.***, 37 S.W.3d [467,] 474 [(Tenn. Ct. App. 2000)]; ***In re M.W.A., Jr.***, 980 S.W.2d [620,] 622 [(Tenn. Ct. App. 1998)]. Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable, ***State Dep't of Children's Servs. v. Demarr***, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. Aug.13, 2003) (No Tenn. R. App. P. 11 application filed), and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. ***In re Valentine***, 79 S.W.3d 539, 546 (Tenn. 2002); ***In re S.M.***, 149 S.W.3d at 639; ***In re J.J.C.***, 148 S.W.3d 919, 925 (Tenn. Ct. App.2004). It produces in a fact-finder's mind a firm belief or conviction

regarding the truth of the facts sought to be established. ***In re A.D.A.,*** 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); ***Ray v. Ray,*** 83 S.W.3d at 733; ***In re C.W.W.,*** 37 S.W.3d at 474.

***Id.***

If the trial court determines that clear and convincing evidence supports grounds for termination in light of its factual findings, the court "should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest." ***In re Kaliyah S.***, 455 S.W.3d at 555. The party petitioning for the termination of parental rights bears the burden of demonstrating that termination is in the best interests of the child by clear and convincing evidence. ***In re Angela E.***, 303 S.W.3d 240, 250 (Tenn. 2010).

We review the trial court's findings of fact *de novo* upon the record with a presumption of correctness. Tenn. R. App. P. 3; ***In re Carrington H.***, 483 S.W.3d 507, 524 (Tenn. 2016) (citations omitted). However, "[i]n light of the heightened burden of proof in termination proceedings … [we] must make [our] own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." ***In re Carrington H.***, 483 S.W.3d at 524 (citation omitted). Furthermore, when the trial court has seen and heard witnesses, we give great deference to any findings that are based on the court's assessment of witness credibility. ***In re M.L.P.***, 228 S.W.3d 139, 143 (Tenn. Ct. App. 2007) (citation omitted). We will not reverse a finding based on witness credibility unless the record contains clear and convincing evidence to contradict it. ***Id.*** The trial court's conclusion that clear and convincing evidence supports termination of parental rights is a conclusion of law that we review *de novo* with no presumption of correctness. ***In re Carrington H.***, 483 S.W.3d at 524 (citation omitted). With these standards in mind, we turn to our review of the trial court's findings of facts and conclusions of law in this case.

## IV. Ground for Termination

A court may terminate a parent's rights if the parent "has been found to have committed severe child abuse as defined in Tennessee Code Annotated § 37-1-102, under any prior order of a court or is found by the court hearing the petition to termination parental rights . . . to have committed severe child abuse against any child." Tenn. Code Ann. § 36-1-113(g)(4). Because Tennessee Code Annotated section 36-1-113(g)(4) refers to "any child," a parent's rights can be terminated on this ground even though the parent did not severely abuse the child or children that are the subject of the petition. Tenn. Code Ann. § 36-1-113(g)(4); *see* ***In re Sebashtian K.***, No. E2020-01439-COA-R3-PT, 2021 WL 5071966, at *6 (Tenn. Ct. App. Nov. 2, 2021) ("As the statute makes clear, a parent's rights may be terminated when the parent 'ha[s] committed severe child abuse against any

child.'"); *see also* **In re Trinity S.**, No. E2021-00098-COA-R3-PT, 2021 WL 3486188, at *6 (Tenn. Ct. App. Aug. 9, 2021) (holding that because mother committed severe child abuse against one child her parental rights could be terminated as to her other two children). As is relevant to this case, "severe child abuse" is defined as "[t]he knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death . . ." Tenn. Code Ann. § 37-1-102(b)(27)(A)(i).

In its order terminating Mother's parental rights, the trial court held:

> In the case at bar, the parties have stipulated to the ground of severe child abuse . . . . Specifically, the court finds that [Mother] was found to have committed severe child abuse in the care of her [Children] pursuant to a Memorandum Opinion and Order of Adjudication and Disposition entered by this court on June 11, 2019 . . . and submitted as trial exhibit #5 in this cause. In light of the foregoing, the court accepts the stipulation of the parties and hereby finds by clear and convincing evidence that the ground of severe child abuse has been established as a ground for termination of [Mother's] parental rights . . . .

Although the trial court "accept[ed] the stipulation of the parties," the Tennessee Supreme Court has held that, in order to terminate a parent's parental rights, the trial court is statutorily required to make written findings of fact and conclusions of law supported by clear and convincing evidence presented at the hearing regardless of whether the parent consents to or contests the termination. **In re Angela E.**, 303 S.W.3d at 256; *see also* **C.J.H. v. A.K.G.**, No. M2001-01234-COA-R3-JV, 2002 WL 1827660, at *8 (Tenn. Ct. App. Aug. 9, 2002) ("An [unopposed] action to terminate parental rights . . . is subject to the same statutory requirements as one that is opposed: proof by clear and convincing evidence that grounds exist and that the child's best interests are served by the termination."). Thus, the party seeking termination of parental rights is not relieved of its statutory burden of proving by clear and convincing evidence both the ground for termination and that termination is in the child's best interest simply because a parent does not oppose the termination.

Further, "questions of law are not subject to stipulation by the parties to a lawsuit," **Mast Advert. & Publ'g, Inc. v. Moyers**, 865 S.W.2d 900, 902 (Tenn. 1993), and a "trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law." **In re Carrington H.**, 483 S.W.3d at 524. A stipulation that evidence satisfied a statutory ground for termination or that termination of parental rights was in a child's best interest would be a nullity. *See* **Mast Advert. & Publ'g, Inc.**, 865 S.W.2d at 902 ("[A] stipulation purporting to state a proposition of law is a nullity.").

Although the trial court accepted Mother's stipulation, it also heard proof concerning the ground of severe child abuse. On appeal, we must determine whether the proof presented together with any facts to which Mother stipulated constituted clear and

- 9 -

convincing evidence of both the ground for termination and that termination was in the Children's best interests.

Having reviewed the record, we conclude that the issue of severe child abuse is res judicata. The doctrine of res judicata applies when

> an existing final judgment rendered upon the merits, without fraud or collusion, by a court of competent jurisdiction, is conclusive of rights, questions and facts in issue as to the parties and their privies, in all other actions in the same or any other judicial tribunal of concurrent jurisdiction.

*In re Heaven L.F.*, 311 S.W.3d 435, 439 (Tenn. Ct. App. 2010) (quoting *Galbreath v. Harris*, 811 S.W.2d 88, 90 (Tenn. Ct. App. 1990)). The doctrine works to "bar[] a second suit between the same parties or their privies on the same cause of action with respect to all issues which were or could have been litigated in the former suit." *Massengill v. Scott*, 738 S.W.2d 629, 631 (Tenn. 1987). This Court has applied the doctrine "to prevent a parent from re-litigating whether she committed severe child abuse in a later termination of parental rights proceeding, when such a finding had been made in a previous dependency and neglect action." *In re Heaven L.F.*, 311 S.W.3d at 439.

Turning to the record, both the Davidson County juvenile and circuit courts found that Mother committed severe child abuse against the Twins. This Court affirmed the severe abuse adjudication on appeal. *In re Zaliyah S.*, No. M2019-01241-COA-R3-JV, 2020 WL 3494471, at *9 (Tenn. Ct. App. June 26, 2020) (no perm. app. filed). Accordingly, the issue of whether Mother committed severe child abuse against the Twins was fully litigated and is res judicata. Because the statutory ground allows a court to terminate a parent's rights when he or she has been found "to have committed severe child abuse against **any child**," Tenn. Code Ann. § 36-1-113(g)(4) (emphasis added), the finding of severe child abuse against the Twins may also form the basis of the trial court's termination of Mother's parental rights to Jaliyah. Because the question of severe child abuse is res judicata, we conclude that the trial court properly terminated Mother's parental rights to all three Children on this ground.

### V. Best Interests

Once it is determined that a ground exists for terminating a party's parental rights, the focus then shifts to whether termination is in the child's best interest. *In re Audrey S.*, 182 S.W.3d at 877. Tennessee Code Annotated section 36-1-113(i) provides a non-exhaustive list of factors for the trial court to consider in its best interest analysis, to-wit:

> (i)(1) In determining whether termination of parental or guardianship rights is in the best interest of the child, the court shall consider all relevant and child-centered factors applicable to the particular case before the court.

- 10 -

Those factors may include, but are not limited to, the following:

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the

- 11 -

home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

(2) When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest.

The statutes recognize that, notwithstanding clear and convincing evidence of grounds for termination, termination of parental rights is not always in the child's best interest. *In re I.E.A.*, 511 S.W.3d 507, 517 (Tenn. Ct. App. 2016), *perm. app. denied* (Tenn. Oct. 24, 2016). Whether termination of parental rights is in the child's best interest must be "'viewed from the child's, rather than the parent's, perspective.'" *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017) (quoting *In re Audrey S.*, 182 S.W.3d at 878). "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child[.]" *Id*. (quoting Tenn. Code Ann. § 36-1-101(d) (2017)). Clearly, the best-interest analysis requires "more than a 'rote examination' of the statutory factors." *Id*. at 682 (quoting *In re Audrey S.*, 182 S.W.3d at 878). Further, it "consists of more than tallying the number of statutory factors weighing in favor of or against termination." *Id*. (citing *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004)). Although the trial court must consider all the statutory factors and other relevant proof, one factor may be determinative of the best-interests analysis in light of the circumstances surrounding the particular child and parent. *Id*. (quotation omitted). The trial court's factual findings relevant to the best-interest analysis must be supported by a preponderance of the evidence. *In re Kaliyah S.*, 455 S.W.3d at 555 (citation omitted). The trial court also must determine whether the combined weight of the facts amounts to clear and convincing evidence that it is in the child's best interest to terminate parental rights. *Id*. (citation omitted).

In its order terminating Mother's parental rights, the trial court made the following findings concerning the Children's best interests:

**(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;**
With respect to this factor, the Court finds it weighs in favor of termination. It is clear the [C]hildren have resided in a stable environment with [Grandmother] for nearly 6 years. Given the ages of the [C]hildren, they have practically been in the care of the [Grandmother] their entire life and refer to her as "mom". While it appears as though [Mother] maintained a stable living environment for herself and Yemaya, she has never done so for the [C]hildren at issue in this case. The only option for the continued stability of the [C]hildren is in the care of the [Grandmother].

**(B) The effect a change of caretaker and physical environment is likely to have on the child's emotional, psychological, and medical condition;**
With respect to this factor, the Court finds it weighs in favor of termination. The record is replete with findings and testimony of [Mother's] repeated failures to adequately and appropriately tend to the medical needs of her [C]hildren. In this case, the [T]wins nearly died because of her failure in this regard. Further, there was unrebutted testimony that after visits with the minor [C]hildren, the [C]hildren exhibit behavioral problems which are impacting their educational well-being. Lastly, although [Mother] testified that she could obtain adequate housing for all of the [C]hildren if they were to come in[to] her custody, her current living arrangements do not provide for the same. The Court finds that a change of caretakers for the [C]hildren, specifically a change of custody or possession to the primary care of [Mother] would likely prove to be detrimental to their emotional, psychological and medical well-being.

**(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;**
With respect to this factor, the Court finds it weighs in favor of termination. It is clear from the record [Mother] has done nothing to meet the basic needs of the [C]hildren at issue in this case as set forth in this factor. The [C]hildren have been in the care of the [Grandmother] for nearly their entire li[ves]. During this time, [Mother] has provided little financial support (other than that which was taken from her wages or federal income tax returns by garnishments), no basic needs other than a pair of shoes, no housing[,] and [has] failed to keep the [C]hildren safe when in her care. Since she has never done any of these things, the Court is unable to find that she will continue to

do so.

**(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;**

With respect to this factor, the Court finds it weighs in favor of termination. The [C]hildren who are the subject of this action have been in the care of the [Grandmother] for nearly 6 years and they are ages 7 and 6. [Mother] has not acted in the role of parent of caregiver for these [C]hildren for the vast majority of their lives and when she did, the [T]wins nearly died from malnutrition. Although the [C]hildren may know [Mother] as their mother, despite the fact they refer to the [Grandmother] as "mom," there has been no proof they have a parental attachment with [Mother]—secure, healthy or otherwise.

**(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;**

With respect to this factor, the Court finds it weighs in favor of termination. The proof revealed [Mother] has been inconsistent with the visitation granted to her for [the Twins] . . . . The record further shows she could exercise more visitation than currently ordered if she allowed the [Grandmother] to supervise the visitation; however, she has chosen not to do so. Additionally, [Mother] does not exercise visitation with Jaliyah. She testified this is because the [Grandmother] will not allow the visitation, yet she has taken no steps to obtain the same.

\*\*\*

**(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;**

With respect to this factor, the Court finds it weighs in favor of termination. The only other persons the [C]hildren have created a healthy parental attachment [with] is the [Grandmother] and perhaps [with Mother's cousin] as it relates to Jaliyah. The Court further finds the [C]hildren have more of a healthy parenting attachment with [Grandmother] than [Mother].

\*\*\*

**(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the**

**use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;**

With respect to this factor, the Court finds it weighs in favor of termination. [Mother] has failed to demonstrate a lasting adjustment of circumstances, conduct and conditions to make it safe and beneficial for the [C]hildren to be in her home. She has continued to substitute her own judgment for that of medical professionals which nearly lead to the death of the [T]wins in this case and delayed giving consent for the [C]hildren to receive medical treatment.

**(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;**

With respect to this factor, the Court finds it weighs in favor of termination. [Mother] provided no documentation of definitive proof she has been compliant with the mental health services required by the Department and Permanency Plan. Further, she has both failed to substantially comply with the visitation afforded to her and maximize visitation with the [C]hildren by allowing the same to be supervised by [Grandmother]. Said visitation would have been helpful to [Mother] in establishing and maintaining a secure and healthy parental relationship.

**(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;**

With respect to this factor, the Court finds it weighs in favor of termination. The [C]hildren who are the subject of this action came into the care/legal custody of [DCS] within a year of birth. At all times while in the custody of [DCS], until this Petition was filed on October 28, 2021, [DCS] worked with [Mother] to assist her in making lasting adjustments to improve her situation and relationship with her [C]hildren. However, the Mother failed to adequately take advantage of the same and in fact has been untruthful both to [DCS] and [the] Court in various proceedings which has thwarted attempts to assist her.

**(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;**

With respect to this factor, the Court finds it weighs in favor of termination. [Mother] had nearly 6 years to establish a meaningful relationship with her [C]hildren that are the subject of this action, participate in mental health

services and address issues that lead to the removal and continued removal of the [C]hildren in her care. The record is deficient [of] testimony, proof and records that establish she has put forth more than little effort to address the areas of concern. At a minimum, she should have knowledge and understanding as to her actions that lead to the removal of the [C]hildren and she has failed to simply acknowledge or display the same. Without taking this first step, all other actions are insignificant.

**(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;**
With respect to this factor, the Court finds it weighs in favor of termination. As stated above, the parties stipulated to the ground of severe child abuse . . . . Specifically, [Mother] was found to have committed severe child abuse in the care of [the Twins] pursuant to a Memorandum Opinion and Order of Adjudication and Disposition entered by this Court on June 11, 2019 . . . and submitted as trial exhibit #5 in this cause.

**(O) Whether the parent has ever provided safe and stable care for the child or any other child;**
With respect to this factor, the Court finds it weighs in favor of termination. While it appears as though [Mother] has provided safe and stable care for her youngest child Yemaya over the past 2 years, there is no proof she has done the same for the [C]hildren who are the subject of this matter. Instead, the record reflects the dire state of the [T]wins when last in her care, which nearly resulted in their death[s]. The record is further replete with evidence [Mother] is either unaware or unconcerned with her decisions and behaviors [that] endangered these [C]hildren and she instead blames the [Grandmother] in this cause for her shortcomings and poor decision making. It is difficult for the Court to believe these [C]hildren could be safe in the care of [Mother] without her own recognition of her poor decisions and faults and steps to overcome the same.

**(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;**
With respect to this factor, the Court finds it weighs in favor of termination for the reasons set forth in various sections above and specifically section (O). Further, she has not offered any testimony or proof she is aware of basic and specific needs required for the [C]hildren to thrive.

**(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basis and**

- 16 -

**specific needs and in which the child can thrive;**

With respect to this factor, the Court finds it weighs in favor of termination for the reasons set forth in various sections above and specifically section (O). Further, [Mother] testified she currently resides in a home that is inadequate to fully provide for the child currently in her care and the 3 [C]hildren who are the subject of this action, although she may be able to upgrade to a more suitable residence. Further, she has not offered any testimony or proof [that] she is aware of basic and specific needs required for the [C]hildren to thrive.

**(R) Whether the physical environment of the parent's home is healthy and safe for the child;**

With respect to this factor, the Court finds it weighs against termination. Testimony and the record reflect the physical environment of the home of [Mother] is healthy and safe at least as it relates to the care of Yemaya as [to] the [C]hildren who are the subject of this action[, they] have not been present in her home. However, it should be noted the home is inadequate to house the 3 [C]hildren who are subject of this action as well as Yemaya as stated above.

**(S) Whether the parent has consistently provided more than token support for the child;**

With respect to this factor, the Court finds it does not weigh in favor of termination. [Mother] testified she is under a child support order to pay the [Grandmother] $12.50 per month for each of the [T]wins, for a total of $25.00 per month. She agreed she has not consistently paid child support due to lack of employment or incarceration; however, the [Grandmother] has received money from her through IRS tax intercepts from [Mother] and she supports the [C]hildren during visits with the [C]hildren and through the purchase of toys, shoes and tickets for entertainment and activities. The payment records reflect sporadic payments over the 5-year period support was ordered but, there are large sums resulting from income tax interceptions (presumably to satisfy arrearage balances.). Based on the testimony of [Mother] and the payment records submitted as Trial Exhibit #19, the Court finds she has provided more than token financial support for the [C]hildren, through income wage assignments and income tax interceptions.

**(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child;**

With respect to this factor, the Court finds it weighs in favor of termination. As stated above, the record is replete with evidence [Mother] is either unaware or unconcerned with her decisions and behaviors endangered these

[C]hildren and she instead blames the [Grandmother] . . . for her shortcomings and poor decision making.  This in and of itself presents a detriment and danger to the [C]hildren as it relates to the ability of [Mother] to consistently and effectively provide safe and stable care and supervision of the [C]hildren.  The Court is unable to find these [C]hildren could be safe in the care of [Mother] without her own recognition of her poor decisions and faults and steps to overcome the same.

In addition to the foregoing, the trial court also determined that statutory factors (F), (G), and (I) did not weigh in favor or against termination of Mother's parental rights.  The evidence supports the trial court's findings.  Jaliyah has lived with Grandmother since she was eight months old, and the Twins have lived with Grandmother since they were one month old.  In short, they have known no other home.  From the record, the Children are doing well in Grandmother's care.  They have relationships with their great-grandmother, cousins, and other extended family.  However, their relationship with Mother is tenuous.  At trial, Mother testified that she has not seen Jaliyah for more than a year.  Mother's absence from Jaliyah's life is the result of Mother's choice not to exercise her visitation because it is supervised by Grandmother, from whom Mother is estranged.  Mother blames Grandmother for many of Mother's problems and opines that the Children will not be safe in Grandmother's care.  There is no evidence to support Mother's concerns.  The evidence shows that Grandmother has been a constant in these Children's lives and has made great efforts to assist Mother throughout these proceedings and before.  Mother does not appreciate the fact that Grandmother is raising her Children.  Due to her largely unaddressed mental health issues, Mother remains paranoid of all medical personnel and has worked to delay and block necessary medical intervention for the Children.  There is no evidence that this behavior would cease if Mother were to regain custody.

There can be no question that both Jaliyah and the Twins suffered severe malnutrition and failure to thrive while in the brief care of Mother.  In fact, as the trial court notes, Mother admitted that, without DCS intervention, the Twins "would have starved to death." In view of the fact that Mother's mental health issues are ongoing and there is proof that her treatment has been sporadic, it would pose too great a risk to the Children to place them back in Mother's care.  Although there is no evidence that Yalaya has suffered the same malnutrition that her sibling endured, Mother's testimony indicates that Mother still has concerns about all of her children's diets.  Mother testified that Yemaya, who is four years old, is a "vegan." Grandmother testified that during visits Mother feeds the Twins "organic" food that upsets their stomachs.  There is nothing in the record to indicate the root cause of why Mother starved these Children, and so long as that question goes unanswered, it would not be safe for the Children to be returned to her custody.

Furthermore, the record indicates that Mother does not know what schools the Children attend.  She does not know their daily routines.  In short, there is no parental bond between Mother and these Children.  On the other hand, the Children are bonded with

Grandmother, whom they refer to as "mom." At visits, Mother corrects the Children when they call Grandmother mom, and tells them that she is their mother. Mother has told Jaliyah that Grandmother kidnapped her, and Mother has threatened to kidnap the Twins if given an opportunity. The Children love Grandmother and, by all accounts, are well-cared for in her custody. It is clear that removing them from the only stable home they have ever known would be detrimental to their emotional, psychological, and medical health. The evidence clearly and convincingly supports the trial court's determination that termination of Mother's parental rights is in the Children's best interests.

## VI. Conclusion

For the foregoing reasons, we affirm the trial court's order terminating Appellant/Mother's parental rights. The case is remanded for such further proceedings as may be necessary and are consistent with this opinion. Costs of the appeal are assessed to the Appellant, Tamika S. Because Tamika S. is proceeding *in forma pauperis* in this appeal, execution for costs may issue if necessary.

s/ Kenny Armstrong
KENNY ARMSTRONG, JUDGE